# CLIFFORD W. GARDNER AND OTHERS v. JAMES L. CONWAY.[1]

July 6, 1951.

No. 35,317.

[1]Reported in 48 N. W. (2d) 788.

470

*Bundlie, Kelley, Finley & Maun,* for appellant.

*Clifford W. Gardner, C. Paul Smith, Calvin Hunt, Alric Anderson, Irving Gotlieb, Fred Kueppers,* and *Worth K. Rice,* for respondents.

*John D. Randall,* Chairman, *Cuthbert S. Baldwin, Thomas J. Boodell, A. J. Casner, Edgar N. Eisenhower, Edwin M. Otterbourg,* and *Warren H. Resh,* for the American Bar Association, by its Standing Committee on Unauthorized Practice of Law; *Robert J. Nowack,* Chairman, for the Minnesota State Bar Association, by its Standing Committee on Unauthorized Practice of Law; *Fontaine C. Bradley,* for the American Institute of Accountants; *Best, Flanagan, Rogers, Lewis & Simonet,* for the Minnesota Association of Public Accountants and the National Society of Public Accountants; and *Fowler, Youngquist, Furber, Taney & Johnson, G. Aaron*

*Youngquist,* and *John R. Goetz,* for the Minnesota Society of Certified Public Accountants, filed separate briefs *amici curiae.*

MATSON, JUSTICE.

Defendant appeals from an order denying his motion for a new trial.

This action, to have the defendant perpetually *enjoined* from further engaging in the unauthorized practice of law and to have him *adjudged in contempt* of court therefor, was brought by the plaintiffs[2] in their own behalf as licensed lawyers and in a representative capacity in behalf of every other licensed lawyer in Minnesota, as well as in behalf of the courts and the public.[3]

Defendant, who is possessed of only a grade-school education, has never been admitted to the practice of law in Minnesota or elsewhere. During a two-year period immediately prior to the time of trial, he followed the occupation of a public accountant. Prior thereto, he served for three years as a United States deputy collector of internal revenue. Before that, he had worked for six years as the credit manager of a hardware company, about five years as the operator of a collection agency, and for four years as an insurance solicitor and risk inspector.

At and prior to the time with which we are concerned, defendant held himself out to the public by newspaper advertisements and by other advertising media as an "Income Tax Expert," duly qualified to give advice, aid, and assistance to the public generally in the discharge of a taxpayer's duty to make accurate returns of income to the federal government. Defendant alleges that he is thoroughly familiar with income tax rules and regulations. He has used a

---

[2] Plaintiffs are the members of a committee on the unauthorized and illegal practice of law, which is a subcommittee of the Committee on Practice of Law of the Ramsey County Bar Association.

[3] As *amici curiae,* the following organizations have filed briefs with the court: Minnesota Association of Public Accountants, National Society of Public Accountants, Minnesota Society of Certified Public Accountants, American Institute of Accountants, Minnesota State Bar Association, and the American Bar Association.

business card on which he describes himself as a "Tax Consultant" and prominently calls attention thereon to the fact that he was a former deputy collector of internal revenue.

On or about March 4, 1948, Cecil G. Germain, a private investigator employed by plaintiffs to obtain information as to whether defendant was engaged in the practice of law, went to the office of defendant under the assumed name and identity of an alleged taxpayer, George Heinl. Germain, as George Heinl, informed defendant that he operated a truck farm, that he had come to have his income tax return prepared, and that he needed help with certain questions. For a cash consideration, defendant prepared the income tax return and gave Germain professional advice for the determination of the following questions:

(a) Whether the taxpayer, who himself had exclusive control of the operation of the truck farm, was in partnership with his wife, who had contributed one-half of the purchase price, who helped with the work, and who received one-half the profits.

(b) Whether the taxpayer was entitled to claim his wife as an exemption, since he had never been ceremonially married, though maintaining a common-law marriage status.

(c) Whether the taxpayer should file his separate return and advise his so-called common-law wife to file a separate return.

(d) Whether certain money expended on improvements of buildings on the truck farm was deductible from his earnings.

(e) Whether a certain produce loss sustained by frost and subsequent flood was a deductible item.

Aside from the fundamental issue of whether defendant's activities constituted the unauthorized practice of law, we are concerned with these procedural issues:

(1) Does the *district court* have the power to adjudge defendant in contempt of court and to punish him for the unauthorized practice of law?

(2) Does the district court have jurisdiction to enjoin the unauthorized practice of law where defendant's acts of purported law practice did not involve any act or appearance before said court?

(3) Is a justiciable issue presented when the evidentiary base of an action to enjoin the unauthorized practice of law consists primarily of professional acts of advice and service which were furnished for a consideration to a person who was not a bona fide taxpayer, upon a fabricated and hypothetical state of facts, and in connection with the preparation of an income tax return which was never intended to be filed?

■■■■ We shall dispose of the procedural matters first. A proceeding to adjudge a person in contempt of court for the unauthorized practice of law—whether such unauthorized practice occurred within or outside the presence of the court—is punitive and criminal in its nature and is primarily brought in the public interest to vindicate the authority of the court and to deter other like derelictions. In re Frederick Bugasch, Inc. 12 N. J. Misc. 788, 175 A. 110; State ex rel. Indianapolis Bar Assn. v. Fletcher Trust Co. 211 Ind. 27, 5 N. E. (2d) 538; Dangel, Contempt, National Lawyers' Manual (1939) §§ 353, 436; 7 C. J. S., Attorney and Client, § 16c. Although a prosecution for the unauthorized practice of law, as an offense against society, inures incidentally to the individual benefit of properly licensed lawyers, the criminal nature of the proceeding is unaffected. In re Frederick Bugasch, Inc. *supra;* see, Root v. MacDonald, 260 Mass. 344, 367, 157 N. E. 684, 692, 54 A. L. R. 1422.[A] Defendant, contending that the supreme court of Minnesota has the sole and exclusive jurisdiction to adjudge a person in contempt for the unauthorized practice of law, asks us upon this appeal to determine whether the district court had the power to adjudge him in contempt. This we cannot do. We have repeatedly held that a conviction for a criminal contempt, as distinguished from a civil contempt, is not appealable, but must be reviewed by certiorari.

---

[A] As to the distinction between a contempt proceeding, even though its object and result are wholly punitive, and an ordinary criminal proceeding, see Root v. MacDonald, 260 Mass. 344, 365, 157 N. E. 684, 691, 54 A. L. R. 1422; Dangel, Contempt, National Lawyers' Manual (1939) § 161.

Swift & Co. v. United Packing House Workers, 228 Minn. 571, 37 N. W. (2d) 831, and cases cited therein.[5]

■ The district court has jurisdiction to enjoin the unauthorized practice of law, whether such practice takes place within or outside the presence of the court, and such jurisdiction is not destroyed by the criminality of the defendant's misconduct. The criminal nature of unauthorized practice neither gives nor ousts jurisdiction in chancery. Fitchette v. Taylor, 191 Minn. 582, 254 N. W. 910, 94 A. L. R. 356; Cowern v. Nelson, 207 Minn. 642, 290 N. W. 795; see, Miller v. Minneapolis Underwriters Assn. Inc. 226 Minn. 367, 371, 33 N. W. (2d) 48, 51; M. S. A. 481.02.

■ Does a justiciable issue arise when the purported acts of unauthorized practice of law were intentionally performed by defendant upon the mistaken assumption that he was then advising a bona fide taxpayer and was preparing for him a tax return for use in reporting an actual taxpayer's income? Defendant's intentional acts were performed when plaintiffs' private investigator provided the occasion and the opportunity for such performance by calling at defendant's office under an assumed name with a purely fictitious and hypothetical state of facts. Although such investigator employed defendant's services for the sole purpose of obtaining evidentiary information as to the nature of defendant's regular activities, defendant did intentionally give his advice in the same manner as if

[5]As to contempt proceedings generally for the unauthorized practice of law, see Bump v. District Court, 232 Iowa 623, 5 N. W. (2d) 914; State ex rel. Wright v. Barlow, 131 Neb. 294, 268 N. W. 95; State ex rel. Johnson v. Childe, 147 Neb. 527, 23 N. W. (2d) 720; People ex rel. Illinois State Bar Assn. v. Peoples Stock Yards State Bank, 344 Ill. 462, 176 N. E. 901; People v. Securities Discount Corp. 361 Ill. 551, 198 N. E. 681; In re Frederick Bugasch, Inc. 12 N. J. Misc. 788, 175 A. 110; Matter of New York County Lawyers Assn. (Bercu) 273 App. Div. 524, 78 N. Y. S. (2d) 209, 9 A. L. R. (2d) 787, affirmed, 299 N. Y. 728, 87 N. E. (2d) 451; State ex rel. Indianapolis Bar Assn. v. Fletcher Trust Co. 211 Ind. 27, 5 N. E. (2d) 538; In re Morse, 98 Vt. 85, 126 A. 550, 36 A. L. R. 527, with Annotation at p. 533; Rhode Island Bar Assn. v. Automobile Service Assn. 55 R. I. 122, 179 A. 139, 100 A. L. R. 226, with Annotation at p. 236; In re McCallum, 186 Wash. 312, 57 P. (2d) 1259; Appeal of Cichon, 227 Wis. 62, 278 N. W. 1.

a bona fide taxpayer had actually appeared. The fact that the income tax return was based upon fictitious facts and figures is not of itself a defense. Frequently decoy letters and other fictional devices have been employed in law enforcement cases, not to induce the commission of an unlawful act, but to secure information as to whether unlawful acts had been and were being committed. United States v. Lindenfeld (2 Cir.) 142 F. (2d) 829. Defendant here assumes that because the tax return which he prepared was not authentic he could not have committed any offense. He is mistaken. The leading case upon this point is Grimm v. United States, 156 U. S. 604, 609, 15 S. Ct. 470, 472, 39 L. ed. 550, 552, where the court said:

"* * * it is insisted that the conviction cannot be sustained, because the letters of the defendant were deposited in the mails at the instance of the government, and through the solicitation of one of its officers; that they were directed and mailed to fictitious persons; that no intent can be imputed to defendant to convey information to other than the persons named in the letters sent by him, and that as they were fictitious persons there could in law be no intent to give information to any one. * * *

"* * * The mere facts that the letters were written under an assumed name, and that he was a government official—a detective, he may be called—do not of themselves constitute a defence to the crime actually committed. The official, suspecting that the defendant was engaged in a business offensive to good morals, sought information directly from him, and the defendant, responding thereto, violated a law of the United States by using the mails to convey such information, and he cannot plead in defence that he would not have violated the law if inquiry had not been made of him by such government official."

This court followed the Grimm case in State v. Gibbs, 109 Minn. 247, 123 N. W. 810, 25 L.R.A.(N.S.) 449. When the investigator called at defendant's office he did not thereby induce or originate defendant's intent to perform the alleged acts of unauthorized prac-

476

tice, but merely provided the opportunity for defendant to exercise the intent which he already possessed.[6]

An actual intent by defendant to hold himself out to the public as willing to do and as customarily and regularly doing the acts which are here alleged to constitute the unauthorized practice of law is the very basis of these proceedings. In view of the evidentiary establishment of his intent and his regular doing of such acts, does it follow that no justiciable issue is presented simply because the evidence was obtained by the device of a fictitious tax return and a purely hypothetical set of facts? There is nothing fictitious or hypothetical about the basic issue between the parties. Instead of a fictitious, academic, or hypothetical issue, we have an actual, genuine, and live controversy as to whether defendant is guilty of the unauthorized practice of law. We are not concerned with some contingent or threatened event which may never occur. We are dealing with acts of alleged unlawful practice which have occurred. Furthermore, a controversy is not moot where, as here, the judgment of the court will have a swift and definite impact upon defendant by forever enjoining him from giving regular advice and service in connection with the preparation of income tax returns.

Was defendant, however, practicing law when, as a preliminary to and as part of his preparation of an income tax return, he advised the purported taxpayer as to whether he had acquired a partnership status, a valid marriage for exemption purposes, whether he should file a joint return with a woman to whom he had never been ceremonially married, and whether certain building and truck farm improvements, as well as certain losses sustained by frost and subsequent flood, were deductible items?

Much of what is law practice is conducted outside the courtroom, and as to that field of activity we have said:

[6]United States v. Lindenfeld (2 Cir.) 142 F. (2d) 829; United States v. Becker (2 Cir.) 62 F. (2d) 1007; Fiunkin v. United States (9 Cir.) 265 F. 1; Rothman v. United States (2 Cir.) 270 F. 31; Sorrells v. United States, 287 U. S. 435, 53 S. Ct. 210, 77 L. ed. 413; see, People v. Alfani, 227 N. Y. 334, 125 N. E. 671.

"* * * The line between what is and what is not the practice of law cannot be drawn with precision. Lawyers should be the first to recognize that between the two there is a region wherein much of what lawyers do every day in their practice may also be done by others without wrongful invasion of the lawyers' field." Cowern v. Nelson, 207 Minn. 642, 646, 290 N. W. 795, 797.

Although it is difficult to draw any precise dividing line, the task is ours to find some criterion for distinguishing that which is from that which is not law practice. The development of any practical criterion, as well as its subsequent application, must be closely related to the purpose for which lawyers are licensed as the exclusive occupants of their field. That purpose is to protect the public from the intolerable evils which are brought upon people by those who assume to practice law without having the proper qualifications. See, 29 Mich. L. Rev. 989. The need for public protection is not of new origin. As early as 1292, the problem was recognized when Edward I, by royal ordinance, limited the number of attorneys and directed his justices "to provide for every county a sufficient number of attornies and apprentices from among the best, the most lawful and the most teachable, so *that king and people might be well served.*" (Italics supplied.) 1 Pollock and Maitland, History of English Law, p. 194. See, Herbert, Antiquities of the Inns of Court and Chancery, pp. 166, 167. The limitation and selection of lawyers, without strict regulation, proved inadequate.

"* * * The evil finally became so great that in the year 1402 Parliament this time took cognizance of it and enacted the now famous statute, 4 Henry IV, Ch. 18, which provided that all attorneys should be examined by the justices, and in their discretion, only those found to be good and virtuous, and of good fame, learned and

---

¹What is probably the first Anglo-Saxon statute regulating the practice of the law was passed in 1275 as the Statute of Westminster, the First. 3 Edwardi I, c. 29 (1 Stat. at Large, p. 94). The professional lawyer, however, began to appear in Anglo-Saxon England shortly after the Conquest. See, Cohen, The Law:—Business or Profession? (1924) pp. 84–86.

sworn to do their duty, be allowed to be put upon the roll and all others put out." Rhode Island Bar Assn. v. Automobile Service Assn. 55 R. I. 122, 133, 179 A. 139, 144, 100 A. L. R. 226.

These early English statutes illustrate that a licensed bar subject to the supervision of the courts originated with a public demand for the exclusion of those who assumed to practice without being qualified therefor.

▮▮ The protection of the public, as the purpose of confining law practice to a licensed bar, ancient as it is in its origin, is of vital importance today. See, In re Estate of Peterson, 230 Minn. 478, 42 N. W. (2d) 59; Cowern v. Nelson, 207 Minn. 642, 290 N. W. 795; M. S. A. 481.02. Any criterion for distinguishing law practice from that which belongs to other fields can be properly geared to the public welfare only if we keep in mind the manner in which the licensing of lawyers serves its purpose. The law practice franchise or privilege is based upon the threefold requirements of *ability, character*, and *responsible supervision*. The public welfare is safeguarded not merely by limiting law practice to individuals who are possessed of the requisite ability and character, but also by the further requirement that such practitioners shall thenceforth be officers of the court and subject to its supervision. See, 40 Dickinson L. Rev. 225, 229. In consequence, lawyers are not merely bound by a high code of professional ethics, but as officers of the court they are subject to its inherent supervisory jurisdiction, which embraces the power to remove from the profession those practitioners who are unfaithful or incompetent in the discharge of their trust. In re Disbarment of Ithamar Tracy, 197 Minn. 35, 266 N. W. 88, 267 N. W. 142; see, Opinion of the Justices, 289 Mass. 607, 194 N. E. 313. This is in itself an important reason why law practice should be confined to members of the bar. Protection of the public is set at naught if laymen who are not subject to court supervision are permitted to practice law. Although professional standards for safeguarding the public interest must be sufficiently flexible to allow for adaptation to changes in conditions, they must in any event be of such stability and permanence as to protect the individual practi-

tioner in the enjoyment of his professional franchise; otherwise men of ability and character will find no inducement to undergo the years of training necessary to qualify them as lawyers. This principle, as a part of the public weal, is applicable to any profession which demands of its members high skill and proficiency based upon years of intensive preparatory training. State v. Bailey Dental Co. 211 Iowa 781, 234 N. W. 260; 5 Fordham L. Rev. 207.

If we bear in mind that any choice of criterion must find its ultimate justification in the interest of the public and not in that of advantage for either lawyer or nonlawyer, we soon cease to look for an answer in any rule of thumb such as that based upon a distinction between the incidental and the primary. See, People v. Title Guarantee & Trust Co. 227 N. Y. 366, 379, 125 N. E. 666, 670; Merrick v. American Security & Trust Co. 71 App. D. C. 72, 107 F. (2d) 271. Any rule which holds that a layman who prepares legal papers or furnishes other services of a legal nature is not practicing law when such services are incidental to another business or profession completely ignores the public welfare. A service performed by one individual for another, even though it be incidental to some other occupation, may entail a difficult question of law which requires a determination by a trained legal mind. See, 33 Minn. L. Rev. 445. Are we to say that a real estate broker who examines an abstract of title and furnishes an opinion thereon may not be held to practice law merely because the examination of a title is ancillary to a sale and purchase of real estate? Can we say that a lawyer employed to bring a suit for damages for personal injuries is competent to diagnose the nature of his client's injuries and that he is not practicing medicine merely because such diagnosis is incidental to a proper presentation of his client's case? The drawing of a simple instrument or the application of an elementary legal principle is one thing in the incidental classification, but it is wholly another when such incidental act or service requires professional skill. The incidental test has no value except in the negative sense that if the furnishing of the legal service is the primary business of the actor such activity is the practice of law, even though

such service is of an elementary nature. In other words, a layman's legal service activities are the practice of law unless they are incidental to his regular calling; but the mere fact that they are incidental is by no means decisive. In a positive sense, the incidental test ignores the interest of the public as the controlling determinant.

In rejecting the incidental test, it follows that the distinction between law practice and that which is not may be determined only from a consideration of the nature of the acts of service performed in each case. No difficulty arises where such service is the primary business of the actor. We then have law practice. Difficulty comes, however, when the service furnished is incidental to the performance of other service of a nonlegal character in the pursuit of another calling such as that of accounting. In the field of income taxation, as in the instant case, we have an overlapping of both law and accounting. An accountant must adapt his accounting skill to the requirements of tax law, and therefore he must have a workable knowledge of law as applied to his field. By the same token, a lawyer must have some understanding of accounting. In the income tax area, they occupy much common ground where the skills of both professions may be required and where it is difficult to draw a precise line to separate their respective functions. The public interest does not permit an obliteration of all lines of demarcation. We cannot escape reality by hiding behind a facade of nomenclature and assume that "taxation," though composed of both law and accounting, is something *sui generis* and apart from the law. See, Matter of New York County Lawyers Assn. (Bercu) 273 App. Div. 524, 78 N. Y. S. (2d) 209, 9 A. L. R. (2d) 787, affirmed, 299 N. Y. 728, 87 N. E. (2d) 451. If taxation is a hybrid of law and accounting, it does not follow that it is so wholly without the law that its legal activities may be pursued without proper qualifications and without court supervision. The interest of the public is not protected by the narrow specialization of an individual who lacks the perspective and the orientation which comes only from a thorough knowledge and understanding of basic legal concepts,

of legal processes, and of the interrelation of the law in all its branches.[8] Generally speaking, whenever, as incidental to another transaction or calling, a layman, as part of his regular course of conduct, resolves legal questions for another—at the latter's request and for a consideration—by giving him advice or by taking action for and in his behalf, he is practicing law if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand the application of a trained legal mind. What is a difficult or doubtful question of law is not to be measured by the comprehension of a trained legal mind, but by the understanding thereof which is possessed by a reasonably intelligent layman who is reasonably familiar with similar transactions. A criterion which designates the determination of a difficult or complex question of law as law practice, and the application of an elementary or simple legal principle as not, may indeed be criticized for uncertainty if a rule of thumb is sought which can be applied with mechanical precision to all cases. Any rule of law which purports to reflect the needs of the public welfare in a changing society, by reason of its essential and inherent flexibility, will, however, be as variable in operation as the particular facts to which it is applied.

In restraining laymen from improper activity, *the difficult question of law criterion* is to be applied in a common-sense way which will protect primarily the interest of the public and not

[8] The shortcomings of a narrow specialization is well illustrated by the service given by the respondent to his client in Matter of New York County Lawyers Assn. (Bercu) 273 App. Div. 524, 78 N. Y. S. (2d) 209, 9 A. L. R. (2d) 787, affirmed, 299 N. Y. 728, 87 N. E. (2d) 451. On the other hand, the value of a well-rounded legal training in the income tax field was demonstrated by two Minnesota lawyers in Albright v. United States (8 Cir.) 173 F. (2d) 339, wherein the court held that sales of all dairy and breeding animals used in a farmer's business and owned more than six months were entitled, under § 117(j) of the Internal Revenue Code (26 USCA, § 117[j]), to be treated as sales of capital assets. It has been said that this decision has saved farmers millions of dollars in income taxes. See, 35 Iowa L. Rev. 49.

hamper or burden that interest with impractical and technical restrictions which have no reasonable justification. Cowern v. Nelson, 207 Minn. 642, 290 N. W. 795. We are therefore not concerned with a technical application which would ban the giving of any and all legal advice or the taking of any and all action for another.[9] Whether a difficult or doubtful question of law is resolved by the giving of advice to, or the doing of an act for, another must in each case depend upon the nature of the problem involved. As ancillary to the closing of a real estate transaction, a real estate broker may draw the ordinary instruments of conveyance. Cowern v. Nelson, *supra*. No layman, however, except when dire emergency prevents the calling of a lawyer, may draw another's will. In re Estate of Peterson, 230 Minn. 478, 42 N. W. (2d) 59; M. S. A. 481.02. As applied to the preparation of income tax returns, it has been well said:

"* * * Federal income taxation is founded on statute, elaborated and interpreted by administrative regulations and rulings, and construed by court decisions. Matters in this field, as in other statutory subjects, will at times involve difficult questions of interpretation of statute or court decision, and the validity of regulations or statute; they will also involve doubtful questions of nontax law on which the tax issues may depend, and questions of liability for criminal or civil penalties or of statutes of limitation or of liability as transferee for the taxes of another. Such questions, in general, are the kind for which lawyers are equipped by training and practice."[10]

When an accountant or other layman who is employed to prepare an income tax return is faced with difficult or doubtful questions

---

[9] "Giving any legal advice' would include telling a man whether it is lawful to write 'Please do not open until Christmas' on a parcels post package. 'Any action taken for others in any matter connected with the law' would include parking a man's automobile for him parallel to the curb not over six inches from it." 19 American Bar Assn. Journal 652. [*illegible handwriting*]

[10] Maurice Austin, *Relations Between Lawyers and Certified Public Accountants in Income Tax Practice* (1951), 36 Iowa L. Rev. 227, 228.

of the interpretation or application of statutes, administrative regulations and rulings, court decisions, or general law, it is his duty to leave the determination of such questions to a lawyer. In so holding that the determination of difficult or doubtful questions is the practice of law, it does not follow that the entire income tax field has been preëmpted by lawyers to the exclusion of accountants. The work of an accountant disassociated from the resolving of difficult or doubtful questions of law is not law practice. See, Opinion of the Justices, 289 Mass. 607, 615, 194 N. E. 313, 318. In the determination of income—the subject of taxation—difficult problems may arise by presenting—

"such aspects as inventory pricing methods (last-in-first-out, first-in-first-out, retail method, cost determination, actual costs, standard costs, cost of in-process merchandise, market price valuation, etc.), accrual and installment accounting, carryover and carryback of net operating losses, depreciation, depletion and corporate distributions. The taxation of such income may involve such concepts as consolidated returns, taxable years of less than twelve months, invested capital, etc. All of these are concepts of accounting, * * *." 36 Iowa L. Rev. 227, 229.

Where difficult accounting questions arise, the careful lawyer will naturally advise his client to enlist the aid of an accountant. In the income tax field, the lawyer and the accountant each has a function to perform in the interest of the public.[11]

In the instant case, the evidence sustains the trial court's findings and conclusions that defendant was engaged in the practice of law. For a consideration, and as part of his regular income tax work, defendant advised and determined for the taxpayer whether the latter had attained the status of a lawful marriage with a woman with whom he had been living but to whom he had never been ceremonially married. He further gave advice as to whether such taxpayer and his consort should file separate or joint returns. The purported taxpayer was likewise uncertain as to whether he

[11]See, 1 Catholic University of America L. Rev. 21.

occupied the status of a partner with his so-called common-law wife in the operation of a truck farm, over which he himself exercised exclusive control but in which the latter shared equally in the labor, investment, and profit. This question, the answer to which obviously required legal training, he also resolved. We do not here have the case of a taxpayer whose legal status was established or known beforehand. In addition, defendant gave advice as to the deductions which the taxpayer might claim for certain farm improvements and for certain produce loss by frost and subsequent flood. Although the preparation of the income tax return was not of itself the practice of law, defendant, incidental to such preparation, resolved certain difficult legal questions which, taken as a whole, constituted the practice of law.

In further confirmation of the conclusion that defendant was practicing law, the evidence establishes that he advertised and held himself out as a "Tax Consultant," which by reasonable implication advised the public that he was competent to give legal advice on the law of taxation. A layman, whether he is or is not an accountant, may not hold himself out to the public as a tax consultant or a tax expert, or describe himself by any similar phrase which implies that he has a knowledge of tax law. It should be noted that lawyers, by the canons of ethics of the American Bar Association and the opinions thereto pertaining, are likewise prohibited from advertising any special branch of law practice. Canons of Professional and Judicial Ethics, American Bar Association, Canons 27 and 45, and see Opinion 260.

The order of the trial court is affirmed.

Affirmed.